**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3671-24

SHOMIAL AHMAD,

    Complainant-Appellant,

v.

BLUE STONE I HOLDINGS, LLC
d/b/a CAST IRON LOFTS II,

    Respondent-Respondent.

_____

Submitted May 19, 2026 – Decided July 23, 2026

Before Judges Rose and Torregrossa-O'Connor.

On appeal from the New Jersey Division on Civil Rights, Department of Law and Public Safety, Docket No. H2022-000701.

Shomial Ahmad, self-represented appellant.

Griffin Alexander, PC, attorneys for respondent Blue Stone I Holdings, LLC (William Rodriguez, on the brief).

Jennifer Davenport, Attorney General, attorney for respondent New Jersey Division on Civil Rights (Deborah E. Wassel, Assistant Attorney General, of

counsel; Maryanne Abdelmesih, Deputy Attorney General, on brief).

PER CURIAM

Complainant Shomial Ahmad appeals from a final administrative decision of the New Jersey Division on Civil Rights (DCR) finding no probable cause supported her claim respondent Blue Stone I Holdings, LLC[1] discriminated against her on the basis of her sex and marital status in violation of the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -50. Although not pled in her verified complaint, complainant also argues she was improperly denied a hearing because her rent renewal increase was retaliatory after her complaints regarding the safety of the property. Complainant also raises anew claims the DCR failed to timely investigate her complaint. Reviewing the record in light of applicable legal principles, we affirm.

I.

Blue Stone owns and operates Cast Iron Lofts II (Cast Iron), an apartment complex in Jersey City. From April 2021 through July 2022, complainant rented a two-bedroom apartment at Cast Iron.

---

[1]  At times, complainant and documents contained in the appendix reference Blue Stone as "c/o Greystar Real Estate Partners." Therefore, we use Blue Stone to reference the entity, its agents, or staff acting on its behalf.

A-3671-24

On August 22, 2022, complainant filed a verified complaint with the DCR[2] alleging Blue Stone discriminated against her based on her status as "divorced" and "female," drastically increasing her rent from $3,250 per month to $5,120 per month, an increase of 57%. The complaint pled the following facts and claims.

Complainant's gender and single marital status placed her in a "protected class." Upon notification of the rent increase, complainant informed Liya George, an assistant community manager of Blue Stone, she intended to move as she could not afford the rent increase and declined the property manager's subsequent offer of a reduced rent of $4,012 per month, a 23% increase. She alleged the reduced rent was a higher percentage than that offered to "other married tenants" with leases negotiated by "the husband," citing as an example a couple whose rent was increased 33%, and was negotiated down to 16.8%. Complainant cited viewing "Zillow" rental listings for two-bedroom apartments at Cast Iron in June of 2022 for monthly rents of $4,425 and $3,995 per month.

---

[2] The complaint was "dual-filed" with the United States Department of Housing and Urban Development (HUD). See 42 U.S.C. § 3610(f) (providing "[w]henever a complaint alleges a discriminatory housing practice . . . within the jurisdiction of a State or local public agency; and . . . as to which such agency has been certified under this subsection; the Secretary shall refer such complaint to that certified agency before taking any action with respect to such complaint").

Further, complainant contended that when she first moved into her apartment at Cast Iron, she requested that Blue Stone fix the lock on her door leading to the balcony, but Blue Stone "waited months" to repair it.

In associated intake data dated July 11, 2022, complainant identified her allegations as "discrimination" based on "national origin," "religion," gender, "and being a single (divorced) working mom," and "retaliation," based on her "reporting health and safety issues," including an "unresolved" fire safety issue in the apartment's garage. In an attached letter, complainant identified herself as a "Muslim and a Pakistani-American single mother of a four-year old" whose rent was "drastically raised" because "[she] is a single working mom and because of [her] national origin, Pakistani-American, [her] religion, Muslim, [and her] sex, female." The paperwork contained no facts related to any claims based on race, national origin, or religion.

The DCR opened an investigation. It issued information requests to Blue Stone, reviewed Blue Stone's submissions, including email communications, service request logs, and rental spreadsheets, and conducted interviews. The investigation revealed, during complainant's tenancy, she submitted several repair requests to Blue Stone regarding the door to her balcony, and one complaint to the fire department regarding the parking garage at Cast Iron.

4

Regarding the door, complainant submitted a service request to Blue Stone in May 2021, requesting the installation of locks on her balcony door. Her request stated she "knew the building was waiting for the shipment," but the locks "need[ed] to be installed." "Work notes" from the next day marked the request resolved, indicating "unfortunately, parts are still unavailable. [R]esident will be notified when parts are received."

The following month, complainant sent a follow-up email, reiterating her need for a lock, as she was unable to fully close the balcony door. Maintenance staff fixed the balcony door on July 1, so that it no longer remained partially open. When complainant noted the missing hardware was "still an issue," Blue Stone replied, "As soon as we get the door handles we will put one in for you."

In August, complainant submitted another service request indicating she remained unable to lock the balcony door and inquired when a lock would be installed. Complainant followed up twice on this request, and on August 30, the balcony door handle was installed. However, complainant filed a follow up service request in September, indicating her concern that the lock presented a safety issue because she could get locked out on the balcony. One day later, Blue Stone resolved the request, stating, "no issues found. [D]oor locks as

intended too, please refrain from completely turning the handle, as it will lock even if the patio door is open."

On April 20, 2022, complainant sent an email to the Jersey City Fire Department, inquiring whether leaving doors connecting the apartment building to the parking garage "routinely open" constitutes a fire hazard. Complainant explained Cast Iron repeatedly leaves these doors "ajar" because "[t]hey do not shut properly." It appears the fire department did not respond, and there is no indication in the record that Blue Stone or its agents were copied on the correspondence.

On May 6, 2022, George contacted complainant informing complainant her lease would be expiring on July 19, 2022 and offering complainant new lease terms. The "lease renewal offer" contained several options available to complainant: $5,120 per month for a twelve or thirteen-month lease; $5,131 per month for a fifteen or sixteen-month lease; or $9,109 per month for a month-to-month lease. Attached to this notice were two forms, a lease renewal form and a notice to vacate form.

On May 12, complainant emailed George indicating the increased rents were "unconscionable" and outside her ability to pay as a "single working mom." Complainant also requested information regarding "comparable rents in the

6

area"; "significant upgrades to justify the increase"; "annual percentage increases in rent for the same period for other comparable rentals in the area"; and "any other factors that have informed the leasing management's decision to increase the rent."

George responded the next day explaining the methodology for rent determinations. She stated:

> There is a whole leasing matrix from where we pull your current proposed rate from. These are all based on market conditions and supply and demand which are approved directly from ownership. Market lease rate is the current rental rate that a space would likely command in the open market, indicated by current rents paid for comparable space within a given market. A lease executed at the market lease rate is said to be "at market" or "market rate." As a renter, you are more than welcome to do your research of the surrounding area and familiarize yourself with the comparable buildings, floorplans and rates. In the meantime, I will see if there is any flexibility with this rate and follow up with you next week.

Complainant responded the same day thanking George for her response. On May 17, complainant sent George another email stating her intent to move out and noting, because she did not hear back from George, she surmised there was no flexibility in the rent increase offered to her. George responded the next day, reiterating that complainant's rent increase was based on a "matrix" that is "based on market conditions." George further explained complainant's "current

7

floor plan" "start[s] at $5,120 for a [fifteen]-month lease term on new leases," but "val[ued her] residency and would love for [her] to stay." George then offered complainant, "a rate of $4,012." George asked complainant to advise of her interest and extended complainant's move-out date from July 19 to July 31.

Complainant responded, stating:

> Thanks for reducing the proposed rent increase from a more than 55% increase down to a 23% increase, a day before the Cast Iron's deadline that I should inform you of my move out. Unfortunately, I cannot afford the base rent of $4,012 a month. I was not expecting or planning for such a drastic rent increase.

Complainant's email also reiterated her intent to complete a notice to vacate form and move out by July 31.

In a written submission to the DCR, Blue Stone elaborated on the "matrix" used to set rent increases "pursuant to an algorithm." It explained "the calculations are based on market conditions and supply and demand" to "approximate the monthly rent each apartment would likely command in the open market." According to Blue Stone, rent renewals "fluctuate," and are based on "[f]actors beyond just the size of the apartment are taken into consideration (e.g., its location within the complex)."

Addressing complainant's assertion her rent increased more significantly than her married neighbors, Blue Stone stated all rent increases are determined

A-3671-24

through the same matrix and it "does not consider the gender or marital status of any of its residents when offering rents." Blue Stone acknowledged its ability to negotiate with tenants, and explained it usually offers the tenant a rent increase halfway between their current rate and the rate proposed by the matrix. Using as an example complainant's allegation that her neighbors received a smaller increase, Blue Stone explained the matrix proposed a 33% increase for the neighbors, which was then negotiated to a 16.8% increase, roughly the halfway point. It then compared complainant's negotiations, noting the matrix proposed a 57% increase, which was negotiated down to a 23% increase, which is less than the halfway point between the matrix and complainant's current rent.

Blue Stone also addressed complainant's claim she found comparable apartments on Zillow, noting it did "not place[] any of th[o]se advertisements on Zillow.com."

The DCR requested Blue Stone provide information regarding Cast Iron rentals, including floor plans, rents, and rental renewal rates. Blue Stone submitted a spreadsheet showing rent increase offers for all tenants, including complainant, whose leases were ending in July 2022, ranging from a 3% increase to a 65.1% increase. Also, tenants who negotiated and accepted lower rent increases were offered 22% increases or less, meaning if complainant had

accepted the compromise offer of 23% increase, hers would have been the highest negotiated and accepted reduction by 1%.

On June 5, 2025, the DCR Deputy Director issued a written decision on behalf of the DCR finding no probable cause and "clos[ing]" the matter without a hearing on the merits. The decision first summarized the investigation and hearing record, including complainant's rental history and service requests, Blue Stone's matrix and algorithm, and the breakdown of other rent increases at Cast Iron. Having reviewed the record and rental data, the DCR found no discernible pattern suggesting discrimination, finding "[s]ingle men, as well as married men and women, were subject to large increases."

The Deputy Director identified DCR procedure and defined the probable cause standard. Acknowledging "[t]he LAD prohibits discrimination in housing based on membership in a protected class, including sex and marital status," the Deputy Director stated the DCR's conclusion that "the investigation did not find sufficient evidence to support a reasonable suspicion that [Blue Stone] subjected complainant to sex or marital status discrimination."

The Deputy Director further explained, as to complainant's balcony door repair claim, the DCR found the record showed "[Blue Stone] w[as] unable to complete the door-handle repair initially because the necessary parts were on

10

back-order," but "promptly" dispatched maintenance workers in response to complainant's requests and made final repairs "as soon as the required parts were delivered." The DCR also concluded Blue Stone acted "promptly" when complainant expressed concern that the door was not locking properly by providing instructions on how to properly lock the balcony door.

As to complainant's rent increase claim, the Deputy Director stated the record showed "[Blue Stone] engaged with complainant and negotiated the proposed rent increase, offering to reduce it from 57% to 23%." The DCR was satisfied Blue Stone supported its decision to increase rent "with data demonstrating that many tenants have experienced similar rent increases, irrespective of their gender or marital status." It further found that complainant vacated the residence after refusing to accept the 23% increase in rent, and "no evidence . . . to support complainant's assertion that Blue Stone imposed a rent increase on complainant to place her at a disadvantage or did so based on a protected characteristic." Thus, the DCR closed its investigation finding no probable cause supported complainant's allegations of discrimination.

In forwarding the final decision to complainant by letter dated June 5, 2025, the Deputy Director advised complainant of her appeal rights and notified her that she could, alternatively, file a motion for reconsideration with the DCR

11

within thirty days. The letter advised the related HUD "charge" was "also considered closed." Complainant did not pursue reconsideration, and this appeal followed.

## II.

On appeal, complainant argues: (1) the DCR violated state and federal timeliness requirements by failing to complete its investigation "within 100 days" as prescribed by N.J.A.C. 13:4-4.1 and C.F.R. § 103.400(c)(1) to (2); (2) evidence of complainant's rent increase warranted a finding of probable cause as to retaliation and discrimination; (3) the DCR misapplied the probable cause standard; (4) the DCR "failed to investigate unequal terms and services" regarding disparate treatment between complainant's service request and requests of other tenants and the DCR failed to verify Blue Stone's rent increase "matrix"; and (5) the DCR's decision was based on an "incomplete record" and "conclusory" findings.

"We accord 'a strong presumption of reasonableness to an administrative agency's exercise of its statutorily delegated responsibilities.'" Wojtkowiak v. N.J. Motor Vehicle Comm'n, 439 N.J. Super. 1, 13 (App. Div. 2015) (quoting Lavezzi v. State, 219 N.J. 163, 171 (2014)) (excess internal quotation marks omitted). Importantly here, the Legislature has delegated enforcement of the

LAD to the DCR, allowing the Deputy Director to determine whether there is probable cause of discriminatory conduct.  Id. at 12.  Therefore, our "review of [the Director]'s decision is a limited one.  The court must survey the record to determine whether there is sufficient credible competent evidence in the record to support the agency head's conclusions."  Id. at 13 (alteration in original) (quoting Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 587 (1988)).  "We may reverse the Director's decision only if 'the Director's finding is clearly a mistaken one and so plainly unwarranted that the interests of justice demand intervention and correction.'"  Ibid. (quoting Clowes, 109 N.J. at 588).  We may not impose our judgment over that of the agency, and will intervene only when "the agency's decision is shown to have been 'arbitrary, capricious, or unreasonable, or [] not supported by substantial credible evidence in the record as a whole'"  Ibid. (alteration in original) (quoting Barrick v. State, 218 N.J. 247, 259 (2014)).

We first address complainant's argument the DCR failed to conduct its investigation in a timely manner, in contravention of state requirements.  She correctly indicates N.J.A.C. 13:4-4.1(c) requires the DCR, in cases dual-filed with HUD, to complete investigations "within 100 calendar days after the filing of the verified complaint" unless "it is impracticable to do so."  However, other than noting the delay, complainant fails to define the relief she seeks, cite

13

relevant law, or raise specific arguments concerning the time frame of the DCR's investigation. Issues not briefed are deemed waived. See Gormley v. Wood-El, 218 N.J. 72, 96 n.8 (2014). Consequently, we need not address the issue. See Midland Funding, LLC v. Thiel, 446 N.J. Super. 537, 542 n.1 (App. Div. 2016) (when appellant's Notice of Appeal lists issues later "not briefed on appeal," the Appellate Division "considers [the] appeal from those [issues] abandoned . . . [and] waived").

For completeness, however, we note the DCR's investigation was thorough in its search for information following the exchange of pleadings in late 2022. In furtherance of its investigation, the DCR sent multiple requests for documents and information, and the record suggests Blue Stone compiled and provided on a rolling basis its responses including spreadsheets and charts. Blue Stone's last chart of information—its "resident demographics"—is dated April 2024, thus making "impracticable " the DCR's completing its investigation within 100 days. Given the importance of a "complete record" in hearing LAD claims, see Lasky v. Borough of Hightstown, 426 N.J. Super. 68, 81 (App. Div. 2012) (remanding to the trial court for the parties to further develop the record for adjudicating claims under the LAD), it was reasonable for the DCR to await the production of demographic information complainant agrees was highly

A-3671-24

relevant is discerning whether Blue Stone discriminated against complainant on the basis of her gender and marital status.

We further note, "Delay will not generally affect the validity of an administrative determination, particularly where no prejudice is shown." In re Kallen, 92 N.J. 14, 27 (1983) (quoting In re Garber, 141 N.J. Super. 87, 91 (App. Div. 1976)). Absent from the record is any evidence that complainant was prejudiced in any alleged delay on behalf of the DCR or that complainant raised the delay before the DCR. See N.J.S.A. 10:5-15(b) (addressing remedies for administrative delays); see also Reaves v. State, Dep't of Law & Pub. Safety, Div. on Civ. Rts., 303 N.J. Super. 115, 118-20 (App. Div. 1997).

We next consider and reject complainant's arguments the DCR improperly found no probable cause regarding her claims of discrimination. The final decision was amply supported by the record, and we discern no abuse of discretion.

As the Deputy Director acknowledged here, it is a violation of the LAD "to discriminate against any person . . . because of marital status [and] sex in the terms, conditions or privileges of the sale, rental, or lease of any real property or part or portion thereof or in the furnishing or facilities or services in connection therewith." N.J.S.A. 10:5-12(g)-(h). Upon the filing of an

administrative complaint with the DCR, an investigation is conducted to determine whether there is probable cause to support a complainant's allegations. N.J.S.A. 10:5-14; N.J.A.C. 13:4-10.2. Probable cause of discriminatory conduct under the LAD exists if there is "reasonable ground of suspicion supported by facts and circumstances strong enough in themselves to warrant a cautious person in the belief that the [LAD] . . . has been violated[.]" Wojtkowiak, 439 N.J. Super. at 12 (alteration and omission in original) (quoting N.J.A.C. 13:4-10.2(b)).

In Pasquince v. Brighton Arms Apartments, we summarized the requirements for establishing a prima facie case of rental housing discrimination and explained the "burden shifting" template used in resolving those claims. 378 N.J. Super. 588, 599 (App. Div. 2005). Under this framework, the plaintiff initially bears the burden to establish: "(1) plaintiff is in the class of persons [the statute] is intended to protect; (2) defendant was aware that plaintiff is a member of the protected class; (3) plaintiff was ready and able to accept defendant's offer to rent or lease; and (4) [defendant] refused to rent an apartment to plaintiff." Ibid. (alterations in original) (quoting T.K. v. Landmark W., 353 N.J. Super. 353, 360 (Law Div. 2001)). Once a prima facie case is established, "[t]he burden of production then shifts to the defendant to articulate

16

a legitimate, nondiscriminatory reason for denying the plaintiff's rental application." Ibid. (internal footnote omitted). If the defendant successfully meets the burden of production, "the plaintiff then bears the burden of proving that the defendant's articulated reason was merely a pretext for unlawful discrimination." Ibid.

Applying these legal principles to the record before us, we conclude the DCR conducted a fair and thorough investigation and reasonably found no probable cause to support complainant's allegations she suffered a discriminatory rent increase based upon her status as an unmarried female. The DCR investigated Blue Stone's matrix and its application to the demographic of its tenants facing rental renewal. Its decision was anchored in that analysis and in the record, which failed to support a claim complainant's rental increase or subsequent negotiations were disparate from others outside of her protected class—single female. Indeed, we note the data showed some renters outside her demographic received higher increases and complainant was one of only three tenants in July 2022 to receive a rent-increase offer less than the market price for the unit according to the matrix, as the market rate was $4,025, and complainant's offer was $4,012.

Further, Blue Stone represented to the DCR that it does not ask for tenant's marital status or gender in making its offers; in fact, the data showing each tenant's demographics was provided only after the DCR inquired about Blue Stone's matrix. We are satisfied the matrix explained Blue Stone's non-discriminatory methodology for calculating rent increase. Further, we conclude DCR properly determined any delay in repairing complainant's door due to backordered parts had no nexus to her single female status. Thus, we discern no error in the DCR's finding of no probable cause to support complainant's claims on the basis of discrimination.

Regarding complainant's argument that her increased rent amounted to "retaliation" for her complaint to the Jersey City Fire Department regarding the doors from the parking garage to the apartment building remaining open, complainant's verified complaint did not plead retaliation as a basis for relief, this was not raised before the DCR or by way of a request for reconsideration, and the claim is therefore not properly raised on appeal. See Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 300 (1973) (noting appellate courts do not review questions not raised before an administrative agency "unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest" (quoting Reynolds Offset Co. v. Summer, 58 N.J. Super.

542, 548 (App. Div. 1959))).  Substantively, we note only that complainant's email to the fire department did not complain about LAD-protected conduct, a required element of any retaliation claim.  See N.J.S.A. 10:5-12(d) (making it unlawful "[f]or any person to take reprisals against any person because that person has opposed any practices or acts forbidden under [the LAD]").

Finally, we reject complainant's argument the DCR relied on an incomplete record.  Specifically, she claims the record was incomplete because it did not contain correspondence relating to her case before the HUD, portal messages between the DCR and Blue Stone, or the cover letter to the DCR's finding of no probable cause.  However, complainant fails to show how this information would have impacted the DCR's probable cause determination to which we accord great deference as it was based on substantial credible evidence in the record.  See N.J.S.A. 52:14B-10(c).  Further, we note complainant made no motion to supplement or settle the record per Rule 2:5-5, which allows a party to file a motion to reconsider the items comprising the record.

To the extent we have not addressed them, any remaining arguments raised by defendant lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

19

A-3671-24